**STATE of Maine**

v.

**Michael COMMEAU.**

Supreme Judicial Court of Maine.

Argued Nov. 17, 1981.

Decided Dec. 15, 1981.

David M. Cox, Dist. Atty., Gary F. Thorne (orally), Claire A. Julian, Asst. Dist. Attys., Bangor, for plaintiff.

Stern & Goldsmith, J. Hillary Billings (orally), Marshall A. Stern, Jerome B. Goldsmith, Bangor, for defendant.

Before McKUSICK, C. J., and NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

WATHEN, Justice.

Defendant Michael Commeau appeals from convictions for the offenses of rape, 17–A M.R.S.A. § 252 (Supp.1981), and gross sexual misconduct, 17–A M.R.S.A. § 253 (Supp.1981), rendered against him in the Superior Court (Knox County). Defendant was originally indicted for three counts of rape and three counts of gross sexual misconduct, allegedly involving three different complainants. The indictment was returned and first tried in Penobscot County. At trial, two counts were dismissed on the motion of the State and defendant was found not guilty on two counts pertaining to a second complainant. A mistrial was declared as to the two counts which are the subject of this appeal and upon motion of the defendant venue was transferred to Knox County for a second trial resulting in conviction upon both counts.

The defendant argues on appeal that the convictions cannot be permitted to stand and contends that the trial court committed error in (1) failing to dismiss the indictment on grounds of double jeopardy; (2) permitting evidence to be received concerning an identification made during a line-up because the underlying arrest was unlawful; (3) admitting evidence of the victim's identification of the defendant; (4) permitting the victim to testify as to her present understanding of the anatomy of male genitals; (5) allowing the introduction of defendant's prior record of criminal convictions; and (6) refusing to declare a mistrial. We deny the appeal and affirm the convictions.

The jury would have been warranted in concluding that the prosecutrix, a resident of Old Town, was raped and forced to engage in oral sex at knife point during the early evening of November 21, 1979. While she was walking home from work her assailant requested her assistance in repairing a pick-up truck. After the two spent thirty minutes working on the truck, the assailant produced a knife and forced her to accompany him to an area behind a church where the sexual activities took place. While the victim's view was obstructed at times, she did observe the assailant, his vehicle and the license plate for an extended period of time. Subsequently she provided the police

with a general description of the person, the vehicle, and the numbers on the license plate although not the State of registration. Defendant was arrested nine days later driving a vehicle which matched the description and which bore a Massachusetts license plate with numbers identical to those given to the police. After seeing him in a police line-up, the victim identified defendant as her assailant.

## Double Jeopardy

Before the commencement of the second trial defendant moved to dismiss the indictment arguing that there had been no manifest necessity shown for declaring a mistrial at the conclusion of the first trial. *State v. Linscott*, Me., 416 A.2d 255 (1980) contains the most current statement of the duty of the presiding justice to determine whether the jury is genuinely deadlocked before declaring a mistrial and holds that in the absence of such a finding, the second trial is barred by double jeopardy. At the first trial in this case the jury deliberated from 12:30 p. m. until 6:10 p. m. with only a short interruption for the reading of testimony. As they were going to dinner, the jury reported that they were having difficulty reaching an agreement. At 8:50 p. m. the court instructed the jury further and the members deliberated until 11:00 p. m. when they sent a note stating a verdict had been reached on two counts but that the jury was deadlocked on the two counts involved in this appeal. Just before the note arrived, the court had asked counsel if he should make inquiry of the jury as to any prospects for reaching a verdict. Upon receipt of the note the court proposed receiving the verdict on the first two counts and declaring a mistrial on the remaining two counts. When the court inquired if either party objected, defendant's counsel did not object but asked only that the jury be polled.

There was manifest necessity for the declaration of the mistrial on these facts. The trial court has broad discretion in this area and its decision should be accorded great deference. *State v. Linscott* is readily distinguishable. That case involved a declaration of mistrial after receiving one communication from a jury that had deliberated only two and a half hours. The court did not inquire of the foreman or individual jurors as to the possibility of reaching a verdict nor did he allow counsel an opportunity to be heard. In the present case the presiding justice made the decision to declare the mistrial only after approximately nine hours of deliberations, two communications from the jury that they could not agree and an inquiry of counsel as to whether they objected to accepting the disagreement. In light of the great deference to be paid to the trial justice's discretion, we cannot say that his finding of manifest necessity for a new trial was in error.

## Illegal Arrest

On November 30, 1979 the defendant was stopped by the police for a traffic infraction while traveling through Passadumkeag. He was later held until the officers investigating the subject incident arrived and was then transported to the Bangor Police Department where he was required to participate in the line-up which resulted in his identification by the victim. Defendant argues for the first time on appeal that the line-up was the fruit of an illegal arrest and should therefore be suppressed.

This Court has consistently held to the rule that issues will not be considered on appeal unless they were raised at the trial level and the record adequately reflects the particulars thereof to permit a proper disposition of the questions involved, except in a manifest error-serious injustice context or where jurisdiction of the court might be involved.

*State v. Desjardins*, Me., 401 A.2d 165, 169 (1979).

We find no manifest error. Even if defendant had not waived his opportunity to raise the illegality of his arrest, the sparse record provided shows that there was probable cause for arrest in this case.

Probable cause exists where facts and circumstances within the knowledge of

the officers and of which they have reasonably trustworthy information would warrant a provident and cautious person to believe that the arrestee did commit or is committing the felonious offense. *State v. Parkinson*, Me., 389 A.2d 1, 8 (1978). Here, the rape victim herself had provided the police with the license plate number of the vehicle used by her assailant. Moreover, she had given them a general description of her attacker. While the record does not reflect whether this information was possessed by the officer who detained the defendant on the highway, it is clear that the investigating officers had this information. The investigating officers were reasonable and cautious in believing that the arrestee, who was driving the truck and fit the general description, did commit the crime and they properly ordered him held until they arrived at the scene of his detention. *See State v. Gervais*, Me., 394 A.2d 1183 (1978).

### Identification of the Defendant

■ Defendant filed a pretrial motion seeking to supress the out-of-court identification made at the line-up. A full evidentiary hearing was held, and the court ruled that defendant had "failed to carry his burden of proof by a preponderance of the evidence in showing that there . . . [were] unnecessarily suggestive procedures used with respect" to the identification. By ruling against the defendant on the question of whether the pretrial identification was suggestive the court rendered unnecessary the second step of the analysis described in *State v. Cefalo*, Me., 396 A.2d 233 (1979), namely, determining whether the reliability of that identification or any subsequent identification outweighs the corrupting effect of the suggestive procedure. In reviewing the court's denial of the motion to suppress we are required to give great deference to findings of historical fact and to accept those findings unless clearly erroneous. However, the legal conclusions drawn from those historical facts "are subject to the independent examination and judgment of the Law Court." *State v. Cefalo*, 396 A.2d at 240.

The victim's encounter with her assailant was at night in a parking lot partially lit by a street light. Crawling under his truck with him, where it was "quite dark", she assisted him with a repair. During the assault the assailant removed the victim's glasses and tried to keep her eyes covered with a hat which kept slipping. Part of this time they were "nose to nose." Afterwards she walked back to the truck with her attacker and although greatly shaken, briefly made conversation. She gave the police a general description of the assailant.

A week after the rape, the victim viewed a live line-up, which did not include the defendant, without making a positive identification. She helped the police prepare a composite drawing of her attacker. Then under slight hypnosis she viewed a sketch made from the composite. The next day she viewed a photo line-up containing defendant's picture without making an identification. She again viewed the photos at length as she was being driven back to work, examining each picture carefully to determine in what manner they were unlike her assailant. She picked defendant's picture as being like the assailant, but the face was not right. Later that evening she saw a newscast reporting that a suspect had been apprehended in the case. She was called to the police station to identify what she was told was *the* suspect in a live line-up. She recognized an acquaintance in the six man line-up, and of the five remaining all were of similar appearance. She positively identified the defendant as her assailant. Unbeknownst to her, defendant was the only one whose picture had been exhibited to her and was the actual suspect. After the line-up and her identification of the defendant as her attacker, she was told that she had picked the suspect, Michael Commeau and that he was one of the persons upon whom she had commented in the photo array.

■ On appeal defendant contends that the line-up in which he was identified was unnecessarily suggestive and that the trial court erred in its contrary finding and in not then placing the burden of proving that

the identification was independently reliable on the State. We disagree. We recognize that in cases where a photo has been identified as that of the guilty party, any subsequent line-up identification may be based not on the witness' recollection of the person but on the image of the photograph retained by the witness through careful study of it. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); P. Wall, *Eyewitness Identification in Criminal Cases* 68 (1965). In this case the victim did not make an identification from the photo array at any time. After viewing the photos she was asked by the officer to go through them again and to tell him the points of dissimilarity. In doing this she observed that the defendant's photo looked like her assailant but the face was not right, it looked like someone younger. She did not recognize the defendant at the line-up as the person in the photo, nor did she know the name of the person in the photo. Her participation in the prior photo line-up does not render the procedure unnecessarily suggestive. The victim was told and undoubtedly could have inferred from the newscast that the police suspect was in the line-up and defendant argues that this taints the procedure. While we do recommend that the police avoid stating whether a suspect is included in a line-up, undoubtedly one could infer that most, if not all, line-ups include a suspect and that fact does not by itself taint a line-up, *see United States v. Medina*, 552 F.2d 181 (7th Cir. 1977); *United States v. Person*, 478 F.2d 659 (D.C. Cir. 1973).

Defendant seeks to invoke the rule announced in *State v. Doughty*, Me., 408 A.2d 683 (1979) and *State v. Northup*, Me., 303 A.2d 1 (1973) that holds a procedure suggestive if the defendant is presented in a distinctive manner that sets him apart from the other participants. In this case the defendant asserts that he was set apart by

his own conduct in nervously shaking a card which he was holding during the line-up. We need not consider whether the defendant's own conduct without police encouragement or fault may serve to distinguish the defendant so as to render the procedure suggestive, in this case it is not before us. The record of the suppression hearing contains no historical facts to substantiate the allegation that the defendant was engaged in such conduct in a distinguishing manner. It was only at the second trial and in the presence of the jury that defense counsel pursued this line of inquiry.[1]

■ Finally, defendant asserts that the line-up was tainted by the victim's work on the police sketch while under hypnosis and by her participation in the police investigation of the crime. Defendant cites authority for the proposition that hypnosis is dangerously able to plant a fixed and perhaps erroneous image in the person's mind. Assuming, for the sake of discussion, the truth of that proposition, the victim in this case was hypnotized before she viewed defendant's picture and there is no evidence that her hypnotist "planted" any references to defendant while she was under hypnosis. Further as the trial justice found, there could have been no suggestion as to the defendant since he was not considered a suspect until a day after the hypnosis procedure. In summary we find on the basis of our independent examination and judgment of the conclusions drawn from the historical facts, that the trial justice did not err in ruling that the defendant had not established that the procedure used in conducting the line-up was unnecessarily suggestive. There was no error in denying the motion to suppress and consequently both the out-of-court identification and the in-court identification were properly admitted in evidence.

---

1. Defense counsel asked the presiding justice at trial to rule a second time on the suppression of the identification. The justice suggested it was a meaningless act in view of the prior hearing and order on suppression but proceeded to rule on the basis of the evidence presented to the jury that the line-up procedure was not unduly suggestive. Defendant does not contend that the ruling at trial presents any independent or additional basis for review of the original suppression ruling.

*Hearsay Testimony*

The victim had informed the police initially that her attacker was uncircumcised. Since the defendant was admittedly circumcised this presented an issue for trial. Apparently prior to trial the victim had spoken with a Dr. Gary Levinson who imparted some knowledge to her concerning the difficulty of discerning circumcision when the penis is in a flaccid condition. Under questioning from the State the victim confirmed that she had discussed with Dr. Levinson "the difference between circumcised and uncircumcised penises." Having been told that she could not testify to what the doctor told her, she was asked what her present understanding was as to whether her assailant was circumcised. She replied:

> Well, my perception of what I saw has changed. What I saw was a penis in the flaccid state with a lot of skin, wrinkled skin below the head of the penis and in that state it is very difficult to tell whether a penis is circumcised or uncircumcised.

The court admonished the jury to disregard her answer as unresponsive to the question. Dr. Levinson had been called earlier and was not permitted to testify about his prior discussion with her. He was not recalled to testify concerning circumcision after a foundation had been laid. Following the court's instruction to the jury to disregard the answer the State asked if she now had an opinion as to whether her attacker was or was not circumcised. She answered, "I believe that the knowledge that I have gained has changed my perception, yes. I believe he could have been circumcised."

■ Defendant objected to the question and answer and contends that the introduction of the testimony concerning the difficulty of telling circumcised from uncircumcised penises was prejudicial error because it represented a hearsay expert opinion. The challenged statement even if it had not been excluded from jury consideration is not hearsay because it is not offered to prove the truth of the matter asserted but rather to show why the witness was less certain about whether her assailant was circumcised. Out of court statements introduced for the purpose of establishing the fact that the witness relied on the statements and acted accordingly are not hearsay. *Overlock v. Eastern Fine Paper*, Me., 314 A.2d 56 (1974). In the instant case the witness testified about the difficulty in distinguishing circumcised from uncircumcised penises in order to explain her impending change of testimony concerning whether her assailant was circumcised. The testimony, inferably, but not expressly, reflecting what Dr. Levinson told her, goes to her credibility as a witness. Because the evidentiary value of the statement rests solely on the fact that it was said and not on the truth of its contents, it is not hearsay. *State v. Northup*, Me., 318 A.2d 489 (1974). The trial court committed no error in allowing the evidence to be introduced.

*Prior Convictions*

■ Defendant asserts that he was prejudiced by the introduction of evidence of his prior convictions for breaking and entering and larceny. His first contention is that there is no record of the presiding justice properly balancing the probative value of the prior convictions against their prejudicial effect and determining that the former outweighed the latter, as prescribed by M.R.Evid. 609 and *State v. Pinkham*, Me., 383 A.2d 1355 (1978). The defendant has not provided transcripts of the pretrial motions. At trial the justice indicated that he had balanced the factors: "When we took this up before we put down the dates of the convictions. We went into what they were for and I made a ruling as to their probative effect and that I believe is proper, sticking with it."

■ Nothing in the record shows that the presiding justice abused his discretion in allowing the convictions in. Although defendant argues that the convictions were far more prejudicial than probative, they were for larceny and breaking and entering with an intent to commit a crime within. Such convictions are highly probative on the issue of defendant's credibility *State v. Gervais*, Me., 394 A.2d 1183 (1978), and the

court is entitled to take into account the higher probative value of crimes involving dishonesty when it exercises its discretion. *State v. Chubbuck*, Me., 406 A.2d 282 (1979).

 Defendant also argues that his prior convictions are not admissible since they were not admitted at his first trial and therefore the doctrine of law of the case dictates that they be excluded at the second trial. We have previously indicated that the law of the case doctrine does not apply when a mistrial has been declared in a proceeding in which a determination was made on the admissibility of prior convictions. *State v. Chubbuck, supra.* The rationale as set forth in the cases cited in *Chubbuck*, is that the declaration of a mistrial renders the trial itself a nullity and returns both parties to their original positions, as if there had been no trial. *See, e. g., State v. Hale*, 127 N.J.Super. 407, 317 A.2d 731 (1974).

*Mistrial Motion*

The jury began deliberating in the second trial at 12:35 p. m. At 6:30 p. m., upon request, the court clarified its charge. The jury deliberated again from 7:00 p. m. until 9:30 p. m. when they sent a note asking for advice because they did not think they could reach a verdict. Counsel were consulted and defendant expressly refused to move for a mistrial. Having been reinstructed, the jury deliberated from 9:40 p. m. until 11:25 p. m. when further clarifying instructions were requested. The court complied and when the jury retired at 11:35 p. m., defendant moved for a mistrial. The presiding justice denied the motion saying that the jury appeared to be making progress. At 12:30 a. m. after twelve hours of deliberations the jury returned verdicts of guilty on both counts.

 Defendant argues that the trial court required the jury to deliberate for an unreasonable interval, a practice proscribed by the ABA Standards adopted by this Court in *State v. White*, Me., 285 A.2d 832, 838 (1972). The court's decision whether or not to grant a mistrial is subject to review under the standard of abuse of discretion.

*State v. Linscott*, Me., 416 A.2d 255 (1979). In the present case the court consulted with counsel when the jury reported a deadlock and assessed the renewed request for clarification of the charge two hours later as an indication of progress. There is nothing in this record to suggest that the court did anything other than to discharge its duty to determine that the jury is genuinely deadlocked before granting a mistrial. *State v. Linscott*, Me., 416 A.2d at 260. It has not been shown in this case that the length of the jury's deliberations was unreasonable or coercive. The denial of the motion for mistrial was not an abuse of discretion.

The entry is:

Judgments of conviction affirmed.

All concurring.